DIVERSIFIED PRODUCTS COMPANY,
a dissolved Michigan Corporation
and
Warner H. Kimball and Bruce R. Mayhew, Directors and Trustees of Diversified Products Company, Plaintiffs-Appellees,

v.

The FIDELITY & CASUALTY COMPANY OF NEW YORK, Defendant-Appellant.

No. 16315.

United States Court of Appeals
Sixth Circuit.

Feb. 4, 1966.

Robert G. Russell, Detroit, Mich. (Sweeny, Dodd, Kerr, Wattles & Russell, Detroit, Mich., on the brief), for appellant.

Frank K. Zinn, Detroit, Mich. (Dykema, Wheat, Spencer, Goodnow & Trigg, Detroit, Mich., on the brief), for appellees.

Before WEICK, Chief Judge, CECIL, Senior Circuit Judge, and BROOKS, District Judge *.

WEICK, Chief Judge.

We are called upon in this case to construe the products hazard exclusion clause contained in a Comprehensive General-Automobile Liability Policy issued by The Fidelity & Casualty Company to Diversified Products Company [1].

---

* Honorable Henry L. Brooks, Chief Judge, United States District Court for the Western District of Kentucky, sitting by designation.

[1]. The exclusion clause reads as follows:
 "(g) Products Hazard. The term 'products hazard' means

 (1) goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, if the accident occurs after possession of such goods or products has been relinquished to others by the named insured or by others trading under his name and if such accident occurs away

The business of Diversified as stated in the policy was the manufacture of automobile fibreboard panels.

In the insuring agreement, Fidelity agreed to pay on behalf of Diversified, all sums which it shall become legally obligated to pay as damages sustained by any person and caused by accident. Fidelity further agreed to defend any suit against the insured alleging such injury, even if the suit was groundless, false or fraudulent.

It was stipulated that the policy covered the accident hereafter related, unless excluded under the provisions of the products hazard clause. Diversified did not pay any premium for products hazard coverage and hence was not entitled to the protection afforded by that clause. If the accident was embraced within the coverage provided by the products exclusion clause, then the insurer would not be liable on the policy.

In 1958 Diversified contracted with Ford Motor Company to supply armrests and quarter panels for the 1959 Ford Galaxie automobile. Diversified in turn agreed with Superwood Corporation that the latter would produce the armrests and quarter panels for Diversified. Superwood was to mold, press, and trim the parts involved. The trimming operation, however, required a punch press which Superwood did not possess. At Superwood's request, Diversified informed Superwood of several used presses available for purchase from suppliers in the area. Superwood thereafter selected and purchased one of the presses direct from a supplier.

The press was delivered to Superwood's Duluth, Minnesota plant, where it was inspected, cleaned, oiled, and operated by Superwood employees. The press was also tested by Superwood employees and appeared to be in good working order. No employee of Diversified participated in this operation, although its Production Engineer, Glenn Alsup, was present at the time of installation. Thereafter, the press was shipped to Superwood's Floodwood plant, where it was installed by Superwood's employees. Dies were installed on the press by Superwood's employees under the supervision of Diversified's engineer. Mr. Alsup, who then adjusted the die guides, operated the press, and trimmed several hundred pieces of material. There was evidence that Mr. Alsup was present at the Floodwood plant from time to time to see that the parts trimmed by the press met the specifications of the Ford Motor Company. He made many trips to the Floodwood plant for quality control purposes, both before and after the press was installed and operated.

On August 28, 1958 the press was operated by John Hutchinson, an employee of Superwood. When Hutchinson reached in the press to remove trimmed parts, the press automatically repeated itself. His hands were caught in the press, severely injuring them. No employee or agent of Diversified was present at the time of the accident.

from premises owned, rented or controlled by the named insured or on premises for which the classification stated in division (a) of the declarations excludes any part of the foregoing, provided, such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, rented to or located for use of others but not sold.

(2) operations, if the accident occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the named insured; provided, operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; provided further, the following shall not be deemed to be 'operations' within the meaning of this paragraph: (a) pick-up or delivery, except from or onto a railroad car, (b) the maintenance of vehicles owned or used by or in behalf of the insured, (c) the existence of tools, uninstalled equipment and abandoned or unused materials and (d) operations for which the classification stated."

On July 21, 1960 Hutchinson instituted an action in the United States District Court, District of Minnesota, for damages for personal injuries against the supplier of the press, the repairer, and Diversified. Fidelity was timely notified by Diversified of the Hutchinson claim and suit and was requested to defend the suit. Fidelity refused to defend the suit claiming that the accident was within the "Products Hazards" exclusion clause of the policy. Diversified employed an attorney to defend it in the case. The suit was finally settled for approximately $40,000, of which Diversified contributed $10,500.

Diversified filed the present action against Fidelity in the District Court for reimbursement, under provisions of the policy, of the amount it paid in the settlement and defense of the Hutchinson suit. The action was tried without a jury. The District Court adopted findings of fact and conclusions of law and entered judgment against Fidelity, from which judgment this appeal was taken.

The District Court in its findings of fact and conclusions of law concluded that the "Products Hazard" exclusion could not be held to apply to a phase or incident of the manufacturing process of Diversified. Specifically, the Court held:

" * * * [Diversified's] activities in connection with the procurement, installation, and adjustment of the punch press and * * * [its] activities in connection with quality control were a part of its manufacturing operations, and within the ambit of the phrase in the policy 'Manufacturer of automobile fiberboard' * * * and the comprehensive liability coverage afforded by the defendant."

We think the District Court correctly interpreted the policy. The purpose of products insurance undoubtedly was to afford protection against liability of manufacturers who send out their goods into the channels of commerce. The origin of such liability is the case of MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696.

The express language of (g) (1) of the exclusion clause covers " * * * goods or products manufactured, sold, handled or distributed by the named insured * * *."

The press causing the injury was not a product of Diversified and was not manufactured, sold, handled or distributed by it. Hence the accident did not come within the provisions of (g) (1) of the exclusion. Liberty Mut. Ins. Co. v. Hercules Powder Co., 224 F.2d 293, 54 A.L.R.2d 513 (3rd Cir., 1955).

But Fidelity argues that coverage was excluded under (g) (2) of the clause applicable to operations. This presents a more difficult problem. See McNally v. American States Ins. Co., 308 F.2d 438 (6th Cir., 1962).

Fidelity maintains that Diversified's acitvities in connection with the press were operations carried out in connection with its product and therefore they were within the scope of paragraph (g) (2). These activities included supplying information as to the names of the suppliers of presses, supervision of the installation of dies, operation of the press after its installation, and quality control in the manufacture of the product. They could properly be termed Diversified's normal manufacturing operations as seller of the automobile fibreboard panels. It was these activities which presumably formed the basis of the action for damages filed by Hutchinson against Diversified.

While liability of Diversified to Hutchinson was questioned in the District Court, that issue has not been presented here.

Fidelity relies principally on Standard Acc. Ins. Co. v. Roberts, 132 F.2d 794 (8th Cir., 1942) and New Amsterdam Cas. Co. v. Ellzey, 240 F.2d 618 (5th Cir., 1947). See also Tidewater Associated Oil Co. v. Northwest Cas. Co., 264 F.2d 879 (9th Cir., 1959).

These cases involved accidents caused by products manufactured or sold by the

insured. Here the accident was not caused by a product of the insured, but by a press not manufactured or operated by it.

The comprehensive policy issued by Fidelity was undoubtedly intended to insure Diversified against liability for all accidents except those involving its products or the service which it sells in connection therewith. In our judgment the scope of the exclusion clause should not be expanded so as to embrace accidents occurring in manufacturing operations of the insured, not caused by the products or service in relation to the sale or installation thereof.

 Fidelity also questioned its liability to provide for the defense of the personal injury action. The complaint in that action contained some allegations with respect to the relationship of Diversified to Superwood, which were false and untrue. The policy, however, required Fidelity to provide for the defense of the action even though the claim was groundless. Since we have held that the accident was covered by the policy, it follows that Fidelity was obligated to provide for the defense. New Amsterdam Cas. Co. v. Jones, 135 F.2d 191 (6th Cir., 1943).

Affirmed.